WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Erick Jensen, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>Camco Manufacturing, LLC a foreign corporation; and CWI, LLC, d/b/a Camping World, a foreign corporation<br><br>    Defendants. | No. CV-23-00266-PHX-DGC<br><br>**ORDER** |

Plaintiff Eric Jensen asserts product liability and related claims against Defendants Camco Manufacturing, LLC ("Camco") and CWI, LCC ("Camping World"). Doc. 19. Defendants move for summary judgment. Doc. 72. The motion is fully briefed, and the Court heard oral argument on October 1, 2024. Docs. 72, 78, 81, 82. For reasons stated below, the Court will grant summary judgment in favor of Defendants.

**I.    Background.**

The first amended complaint contains the following factual allegations. On February 8, 2018, Plaintiff purchased a Camco Little Red Campfire ("Campfire") from the Good Sam and Camping World website. Doc. 19 ¶ 10. On December 5, 2020, Plaintiff was using the Campfire when flames "exploded" from it, lighting his jeans on fire and hitting him in the face with debris. *Id.* ¶ 11. Plaintiff removed the jeans, but still sustained third degree burns on his lower right leg, approximately 5 percent of his total body surface. *Id.* ¶¶ 13-14. He also sustained injuries to his face and nose from the debris. *Id.* ¶ 14.

The complaint alleges that the Campfire, which was designed and manufactured by Camco and sold by Camping World, was "in a defective condition and unreasonably dangerous under foreseeable conditions," and the "direct and proximate cause" of Plaintiff's injuries. *Id.* ¶¶ 16-17. The complaint further alleges the device did not contain "fail-safe design features and fail-safe devices" that were "absolutely essential and necessary" to prevent such injuries, and that fail-safe features and devices would have been feasible and cost-effective design alternatives. *Id.* ¶¶ 20, 24.

The complaint asserts four state law claims: strict products liability (Count 1); negligence (Count 2); breach of implied warranty (Count 3); and punitive damages (Count 7). Doc. 19 ¶¶ 15-40, 68-70. Defendants move for summary judgment on all claims, arguing that Plaintiff cannot establish proximate cause because his engineering expert's opinion is inadmissible under Rule 702. Doc. 72 at 2. Alternatively, Defendants argue that even if the expert opinion is admissible, Plaintiff's claim for punitive damages fails because there is no evidence Defendants acted with an "evil mind" as required by Arizona law. *Id.* at 10.

**II.   Summary Judgment Standard.**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court construes the evidence in favor of the nonmoving party and draws justifiable inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III.   Rule 702 and *Daubert* Standards.**

Under Rule 702, an expert may offer "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence or to determine a fact in issue," provided the testimony rests on "sufficient facts or data" and "reliable

principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of expert testimony must show by a preponderance of the evidence that the testimony satisfies each of the rule's requirements. *See* Fed. R. Evid. 104(a); Fed R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.").

The trial court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, only to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013). If the expert's testimony is relevant and reliable, the proponent is entitled to have the jury assess its weight and credibility. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006). But if the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, , at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**IV.   Discussion.**

**A.   The Expert Witness's Opinion and Testimony.**

Plaintiff presents the opinion of Dr. David Bosch to show that the Campfire was defective and that the defects caused the flame that injured Plaintiff. Defendants do not dispute that Dr. Bosch is qualified as an engineering expert under Rule 702(a). They instead assert that his opinion is not based on sufficient facts and data or reliable principles or methods and does not reflect a reliable application of those principles or methods under Rule 702 (b), (c), and (d). Doc. 72 at 2. For the reasons discussed below, the Court finds

that Dr. Bosch's opinion does not satisfy the admissibility requirements of Rule 702 (c) and (d).

Dr. Bosch provides this description of the Campfire's operation:

> The Camco Little Red Campfire functions by connecting a separately obtained [liquified petroleum gas ("LPG")] cylinder containing LPG to the campfire using the connector supplied with the campfire to the LPG tank. After opening the LPG cylinder valve and then adjusting the low-pressure regulator supplied with the campfire, gas is then delivered from the LPG cylinder to the campfire by passing through the supplied regulator, then the supplied gas hose that is connected to the orifice fitting under the campfire log pan. The pressurized gas then passes through the orifice contained within the orifice fitting. As the gas passes through the orifice, the LPG is mixed with air from the surroundings as air passes through the ports in the air mixing coupler. After passing through the air mixing coupler, the LPG-air mixture passes through the burner ring nipple, and then into the burner ring. At first startup, the LPG-air mixture is ignited by the campfire user using an extended lighter. The flame intensity is then controlled/adjusted by the user turning the red knob.

Doc. 73-5 at 58. Photographs of the Campfire are contained in Doc. 73-1 and throughout Dr. Bosch's report at Doc. 73-5.

### 1. Differential Diagnosis Analysis.

Dr. Bosch's methodology is explained most clearly in his affidavit submitted in response to Defendants' motion for summary judgment. After considering alleged defects in the Campfire, which will be discussed more fully below, Dr. Bosch engaged in this reasoning:

> During my review and analysis of this case, I examined several other possibilities regarding how this incident may have occurred including the following:
>
> (A) The Levi's that Mr. Jensen was wearing at the time of the incident;
>
> (B) Accelerants such as gasoline and diesel fuel; and
>
> (C) Alcohol in the form of diluted distilled spirits (e.g., whiskey, vodka, etc.).

4

>As noted below, I eliminated these possibilities based upon the scientific method.

Doc. 78-3 at 2-3. Dr. Bosch similarly testified in his deposition that he considered possible causes of Plaintiff's injury other than the Campfire and ruled them out after determining there was no evidence to support them. Doc. 73-2 at 33-34.

This approach – ruling out various potential causes of the event and arriving, through process of elimination, at the cause that is most likely – is a differential-diagnosis kind of analysis. In differential diagnosis, the expert "assumes the pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234 (9th Cir. 2017). While commonly used in the medical context, courts have considered differential diagnosis approaches by engineering experts. *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401-04 (5th Cir. 2016); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 829-31, 837-38 (N.D. Ohio 2011).[1] The Ninth Circuit has held that "a reliable differential diagnosis may form the basis of an expert's causation testimony." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014).

There is, however, an important qualifier. A causation opinion arrived at by ruling out various possible causes is reliable only if the expert first "ruled in" only those potential causes that could have produced the injury in question. As the Ninth Circuit has explained, the expert must first "compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). "The issue at this point in the process is which of the competing causes are *generally* capable of causing the [event]. Expert testimony that rules

---

[1] The more proper phrase in a causation context is differential etiology. "[T]he term 'differential diagnosis' in a clinical context refers to identifying a set of diseases or illnesses responsible for the patient's symptoms, while 'differential etiology' refers to identifying the *causal* factors involved in an individual's disease or illness." Michael D. Green et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 549, 617 n.1 (Fed. Jud. Ctr. ed., 3d ed. 2011) (emphasis added).

in a potential cause that is *not* so capable is unreliable." *Id.* at 1057-58. Stated differently, "a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury." *Davis*, 2019 WL 5535376, at *2 (quoting *Cavallo v. Star Enter.*, 892 F. Supp. 756, 771 (E.D. Va. 1995)).

Dr. Bosch's method is flawed because he failed to properly "rule in" Campfire defects as a plausible cause of Plaintiff's injury. Dr. Bosch conducted various tests on the Campfire used by Plaintiff, but he was unable to identify a defect that could have caused the flame that injured Plaintiff.

As he began his analysis, Dr. Bosch hypothesized that the event could have been caused by a partial or complete blockage in the Campfire's fuel flow that resulted in "blowback" of the fuel and fire. Doc. 73-5 at 58. He based this hypothesis on an audit document for which he provided little explanation (*id.* at 9) and unidentified "internet resources" (*id.* at 58, 60) that he later described in his deposition as Amazon customer reviews (Doc. 73-2 at 86). To test this hypothesis, Dr. Bosch examined the interior of the Campfire to identify any debris or other blockage of the fuel flow, but he found none. Doc. 73-5 at 27.

To further test the hypothesis, he completely blocked the Campfire's burner ring (where the gas is emitted and the flames appear) with duct tape to simulate complete debris blockage to the fuel path inside the Campfire.[2] Doc. 73-2 at 38-40, Doc. 73-5 at 48-49. When the burner ring was completely blocked and the gas was turned on, gas leaked out of the air mixing coupler joint located below the Campfire pan. Doc. 73-2 at 38-40, Doc. 73-5 at 49. Dr. Bosch detected this leak by applying soapy water to the joint and seeing bubbles form, indicating that gas was leaking. Doc. 73-5 at 55 fig. 4-48. But he did not measure the flow rate of the escaping gas (Doc. 73-2 at 41), and he agreed in his deposition that the level of leakage he observed from the joint would not have been

---

[2] He conducted this test even though he had found no evidence of blockage within the Campfire and did not know whether its fuel flow was fully blocked, partially blocked, or unblocked at the time of Plaintiff's injury.

6

1  sufficient to create a gas cloud large enough to cause the flame Plaintiff described. *Id*. at
2  41-42.  Instead, he characterized the leak as only a "potential contributor" to the event. *Id*.
3  at 41.

4  Dr. Bosch also tested the Campfire's regulator to see if it delivered too much fuel
5  to the device.  Using a pressure gauge, he found that fuel pressure leaving the regulator
6  was 6.1 pounds per square inch (psi), somewhat higher than the 5 psi specified in the
7  Campfire's design.  Doc. 73-5 at 58.  Dr. Bosch testified in his deposition, however, that
8  he was not sure this flow rate "was a big issue in this case."  Doc. 73-2 at 56.  And in his
9  affidavit attached to the summary judgment response, he testified that his "opinions and
10 the basis of these opinions are *not related* to the pressure that was read from the pressure
11 gauge."  Doc. 78-3 at 4 (emphasis added).

12 Dr. Bosch also arranged for the interior of the regulator to be examined with a
13 radiograph to identify defects.  The radiograph found no defects.  Doc. 73-5 at 47.

14 In summary, Dr. Bosch's examination and testing of the actual Campfire at issue in
15 this case identified only two possible defects: (1) an elevated pressure reading from the
16 regulator that he testified is "not related" to his causation opinion, and (2) leakage from a
17 joint when the entire burner ring was plugged, and that he admitted was not sufficient to
18 create the flame Plaintiff described, although it might have been a "potential contributor."
19 Dr. Bosch identified no other defect.

20 When pressed on the fact that his only relevant defect – leakage from a joint when
21 the fuel flow fully blocked – was insufficient to cause the flame that injured Plaintiff, Dr.
22 Bosch gave this telling testimony.

> Q.  Okay.  At some point -- I mean, in order for this to occur the way Mr. Jensen describes, there would have to be a significant amount of gas or a gas cloud sufficient to create a six-foot flame; correct?
>
> A.  Yes.  That's a better way to put it.
>
> Q.  So where, if this leak that you identified isn't sufficient to create that type of gas cloud and it just contributed to it, where would the rest of the gas for the gas cloud be coming from?

7

> A. Well, you opened up a, you know, a more general discussion here, and that is the -- you know, as we've discussed, you've got this leak. You've got the ***transient blockage*** somewhere above the orifice, obviously. And then you -- there are also things that may have happened in a -- or not may, that's not a good word -- are things that have to be considered ***that we don't know about, like some other transient failure in the system someplace***. I know that -- I mean, I know what your job is, and that is to try to pin us down exactly what the cause is. ***None of us is ever going to know that.*** We operate in probabilities, not certainties. Given the facts of the case -- facts that we know about the case, we've got a single combustible material source and we've got a single ignition source. As long as you keep that in mind, well, then, we can talk about contributors to that. But as I have stated, you're never going to know precisely what that was.

Doc. 73-2 at 43-44 (emphasis added).

In other words, when pressed on how the Campfire caused the large flame that injured Plaintiff, Dr. Bosch resorted to speculation. He said that there "obviously" must have been a "transient blockage," even though his examination of the device found no blockage, and even though complete blockage of the fuel flow with duct tape did not produce leakage sufficient to cause the flame in this case. Dr. Bosch further speculated that there must have been something else "that we don't know about, like some other transient failure in the system someplace." But he could not identify or describe this transient failure.

Dr. Bosch's speculation became clearer as the questioning progressed:

> Q. I'll ask it again. It's your testimony that there might have been some other transient failure within the system that caused or contributed to the incident?
>
> A. We certainly can't rule that out. At this point, we, you know, obviously have been talking about it for a while, have been -- ***have done testing that didn't capture anything else but can't be ruled out***. I would always look toward, in this sort of situation, obviously, ***we're talking about something that would result in an excess gas flow, in other words, overwhelming the system, if you will, with flammable gas***. And the only part of the system that could do that would be some, again, ***transient malfunction in the regulator***.

> *We obviously didn't capture a problem there, but I don't know that it could be reasonably completely ruled out either.*
>
> *Q.  Okay.  And you're unable to replicate any transient failures through testing; correct?*
>
> *A.  Correct.*
>
> *Q.  Do you have any evidence of any other type of transient malfunction with the Campfire?*
>
> *A.  No.*  Like I said, the -- you know, obviously, we've got to have gas where it's not supposed to be to have this happen.  And the only other way that I can think of outside of what we discussed earlier on would be some blip in the regulator because that's the only part of the system that could contribute more or would result in higher gas flow for, you know, a transient period.

*Id.* at 45-46 (emphasis added).

Dr. Bosch thus testified that there must have been "something that would result in excess gas flow" that he cannot identify -- possibly a "transient malfunction of the regulator."  He admits, however, that he found no evidence of such a malfunction.[3]

In summary, Dr. Bosch fails to identify a defect in the Campfire that could have caused the flame that injured Plaintiff.  He speculates that the flame must have been due to some transient defect he did not detect, but speculation is not a reliable engineering method under Rule 702(c).  And relying on a speculative cause because it "cannot be ruled out" is not a reliable application of an engineering method to the facts of this case under Rule 702(d).[4]

---

[3] In addition, it is not clear that a "transient malfunction" could lead to Defendants' liability.  For strict product liability and breach of warranty, Plaintiff must prove that the defect existed when the Campfire left Defendants' possession.  *Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 294, 640 P.2d 851, 856 (1982).  If the speculated "transient malfunction" ever existed, Dr. Bosch makes no attempt to show it existed when the product left Defendants' control.  Nor does he attempt to show how Defendants' negligence caused the hypothetical transient malfunction.

[4] Dr. Bosch did not analyze possible environmental conditions that would contribute to a gas cloud, stating that doing so would be "irrelevant."  Doc. 73-2 at 48.

### 2. Another Possible Approach to Causation.

Although not clearly articulated by Dr. Bosch or Plaintiff's counsel, the Court has considered whether there is another approach to causation under which Dr. Bosch's testimony is admissible.

After admitting in his deposition that he has not identified a causative defect in this case, Dr. Bosch painted broadly. He asserted that a defect in the Campfire must have existed because "we've got a single combustible material source and we've got a single ignition source." *Id.* at 44. Again: "I did my best to keep it simple, and that is where [did] the fuel come from and how did it get ignited. There's only one source for the fuel and one known source for the ignition." *Id.* at 48.

This simplification seems to assume Plaintiff could not have been burned unless the Campfire was defective, even though the Campfire was designed to produce an open flame. Indeed, that is why Plaintiff bought it and used it outside his camper on the evening in question – it produced flames and light like a real campfire. *See* Doc. 73-5 at 23 fig. 3-1. Such a device can burn a user even if it is not defective. Like any open flame, whether in a gas oven, barbeque, lantern, or candle, it has the ability to cause burns without being defective. Dr. Bosch's simplification – the Campfire was the fuel source and ignition source and therefore must have been defective – does not apply a reliable engineering principle or method, much less apply it reliably to the facts of this case.

Dr. Bosch may be asserting that circumstantial evidence – the large fireball described by Plaintiff and the fuel and ignition sources provided by the Campfire – shows the Campfire was defective in some way. There are several problems with this approach.

First, it is not articulated by Dr. Bosch, and the Court has made clear that he will not be permitted to testify about conclusions that are not set forth in his expert report or deposition testimony. *See* Doc. 59 at 3.

Second, circumstantial evidence can be used in a strict product liability case, but the proof for such cases requires the defect to have existed when the product left the defendant's control. As the Arizona Supreme Court has explained:

10

> the essence of strict liability is its applicability to situations where plaintiff is precluded by circumstances from pursuing a negligence claim because he or she cannot show defendant *caused* a specific defect while in control of the product. Plaintiff thus, for policy reasons, is allowed to prevail with evidence that some defect *existed* when the product passed from defendant's control to plaintiff.

*Dietz v. Waller*, 141 Ariz. 107, 110, 685 P.2d 744, 747 (1984). Even looking to broader circumstantial evidence (the fireball, the fuel source, and the ignition source), Dr. Bosch fails to identify the defect shown by this evidence, and he fails to opine that the defect existed at the time the Campfire left Defendants' control.[5] Significantly, Plaintiff owned and used the Campfire for almost three years before he was injured. Doc. 19 at 3. It was not newly acquired from Defendants. Furthermore, circumstantial evidence often is necessary because the product itself is not available to be examined. *Dietz*, 141 Ariz. at 110, 685 P.2d at 747. That is not the case here; Dr. Bosch examined the Campfire thoroughly.

Third, far from embracing Plaintiff's description of the fireball as circumstantial evidence of a defect, Dr. Bosch steps away from it. He specifically asserts that Plaintiff's testimony about the size of the fireball "is irrelevant to my analysis" because the severity of Plaintiff's burns and the condition of his jeans indicate the jeans were ignited near the ground. Doc. 78-3 at ¶ 11. And even if we hypothetically change the facts and assume Plaintiff's burns were the result of a ground-level fire rather than Plaintiff's description of a large fireball, there is nothing to indicate the injuries were caused by defects in the

---

[5] Dr. Bosch does note that the Campfire, when sold, did not have a screen to cover the air mixing coupler ports, which could have allowed insects or debris to enter and clog the Campfire. Doc. 73-2 at 22, 24-26, Doc. 73-5 at 53. But he never connects this alleged shortcoming to a defect that could have caused the event in this case. As already noted, he found no debris or insects when he inspected the interior of the device. And when he plugged the gas flow completely with duct tape – to simulate a complete blockage by insects or debris – he was able to detect only the unmeasured bubbles at the air mixing coupler joint, a level of gas flow that he concluded could not have caused the flame Plaintiff described. Thus, even if the lack of a screen is the defect Plaintiff would claim at the time the Campfire left Defendants' control, Dr. Bosch's own testing and opinion show it was not sufficient to cause the event in this case.

Campfire as opposed to the ground-level open flame the Campfire was specifically designed to produce. *See* Doc. 73-5 at 23 fig. 3-1.

### 3. Admissibility Conclusion.

Dr. Bosch failed to find a defect in the Campfire that could have produced the event Plaintiff describes, and resorts to speculation about what might have happened. His differential diagnosis approach was flawed from the beginning because he had no reliable ground for "ruling in" Campfire defects as a cause of Plaintiff's injury. His elimination of other possible causes therefore could never arrive at a reliable opinion that Campfire defects caused the injury. Nor can Dr. Bosch rely on circumstantial evidence for his opinion, for the three reasons explained above.[6]

Because Plaintiff has not shown by a preponderance of the evidence that Rule 702(c) and (d) are satisfied, Dr. Bosch's testimony is inadmissible. Plaintiff's claims for strict products liability, negligence, and breach of implied warranty each require proof of causation. *See Rocky Mountain Fire & Cas. Co.*, 131 Ariz. at 292, 640 P.2d at 854 (proximate cause is required for strict product liability); *Flory v. Silvercrest Indus.*, Inc., 129 Ariz. 574, 579, 633 P.2d 383, 388 (1981) (a breach of implied warranty claim is "in essence" the same as a strict liability claim); *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 243, 745 P.2d 986, 990 (Ct. App. 1987) (a negligent design claim requires Plaintiff "to prove everything he would need to prove under a strict liability theory"). Plaintiff does not dispute that causation is required, and points to no other evidence that can satisfy his causation burden. Because Plaintiff cannot establish causation, summary judgment must be granted on the strict products liability, negligence, and breach of implied warranty claims.

///

---

[6] The Court has also considered whether Dr. Bosch could be asserting some kind of *res ipsa loquitor* theory for Plaintiff's negligence claim, but that does not work either. *Res ipsa loquitor* applies only when the cause of a plaintiff's injury was within the exclusive control of the defendant. *Jackson v. H. H. Robertson Co.*, 118 Ariz. 29, 32, 574 P.2d 822, 824 (1978); *Rocky Mountain Fire & Cas. Co.*, 131 Ariz. at 294, 640 P.2d at 856. The Campfire was not in Defendants' exclusive control when Plaintiff was injured.

### B.     Punitive Damages.

Defendants argue that Plaintiff's claim for punitive damages fails because there is no evidence to support a finding that Defendants acted with an "evil mind." Doc. 72 at 10. Plaintiff cites no evidence to support this claim, and stated at oral argument that he was withdrawing it. Because this case has progressed to the point of summary judgment and Plaintiff cannot produce evidence to support punitive damages, the Court will grant summary judgment on that claim as well.

**IT IS ORDERED:**

1.     Defendants' motion for summary judgment (Doc. 72) is **granted**.

2.     The Clerk is directed to enter judgment accordingly.

Dated this 24th day of October, 2024.

David G. Campbell
Senior United States District Judge